United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EDWARD TAYLOR SITTLER, et al.,

Plaintiffs,

v.

CRESCENT COVE OPPORTUNITY LENDING, LLC, et al.,

Defendants.

Case No. 24-cv-00402-CRB

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs Edward Taylor Sittler, Quatsch Investments, LLC (known just as Quatsch), and Quatsch Revocable Trust (known as Quatsch Trust) and Defendant Crescent Cove Opportunity Lending, LLC have filed cross-complaints seeking declaratory relief and damages arising out of an $8 million promissory loan that Quatsch received from Crescent Cove and allegedly did not repay. Now the parties have filed cross-motions for summary judgment. Having reviewed the parties' briefs and heard argument, the Court **GRANTS** Crescent Cove's motion with respect to its breach-of-contract claim, **DENIES** Crescent Cove's motion with respect to its declaratory judgment claim, and **DENIES** Plaintiffs' motion in full.

## I. BACKGROUND

### A. The Loan Agreement

Plaintiff Sittler founded Color Health, Inc. in 2013. Sittler Decl. (dkt. 35-1) ¶ 3. Sittler eventually sought to liquidate his shares in Color Health and turned to Defendant Crescent Cove, an investment company, for funding. Id. ¶ 4. In January 2022 Sittler and Crescent Cove preliminarily agreed that Crescent Cove would provide Sittler with a two-

United States District Court
Northern District of California

year $8 million loan in exchange for 192,771 shares of Color Health stock. Term Sheet (dkt. 35-2) ¶¶ 2–3, 5. They signed a nonbinding term sheet that expressed their intent to move forward with the loan. Id. at 1, 5.

Sittler and Crescent Cove finalized the loan on April 4, 2022 by executing a promissory note. Promissory Note (dkt. 35-3). The promissory note named Quatsch—an entity formed for the purpose of holding Sittler's shares in Color Health—as the borrower. Id. at 1. Several aspects of the promissory note are relevant here:

First, the note set the price of Color Health stock at $83 per share, meaning the value of the shares that Quatsch used as collateral was $16 million, or twice the amount of the loan. Id. § 2(b). The note required Quatsch to update Crescent Cove each quarter with the fair market value of Color Health stock and to notify Crescent Cove within three days of any transaction of Color Health stock priced below $83 per share. Id. § 14(g) (the Affirmative Covenant Clause). And the note provided that Crescent Cove must not allow the value of its collateral "to be less than $16,000,000 at any time." Id. § 15(j) (the Negative Covenant Clause).

Second, the note defined certain occurrences as "events of default." Id. § 2(d). Failure to provide the quarterly updates and failure to provide notice of sub-$83 stock transactions both would constitute events of default. Id. § 16(c)(i). So would failure to ensure that the value of the collateral remains over $16 million, though the note provides for a 15-day period in which Quatsch could cure a drop in value by acquiring and pledging additional Color Health stock (or cash assets).[1] Id.§ 16(c)(ii) (the Event of Default Clause). Crescent Cove retained the right to accelerate the loan and declare that any interest be paid at an increased default rate following an event of default. Id. §§ 3, 16. In such case, Crescent Cove would also be entitled to reasonable costs, expenses, fees, and charges, including attorney fees and costs regarding enforcement of the note or events of default. Id. §§ 16(a), 25.

[1] Neither party suggests that Quatsch obtained or pledged cash assets to cure any drop in Color Health's stock price.

Third, because Quatsch was unable to pledge all 192,771 shares on April 4 (the date the parties finalized the loan), Sittler and Quatsch Trust entered into a guaranty agreement until Quatsch could obtain the consents it needed to pledge all the necessary shares. Guaranty Agreement (dkt. 35-4). The guaranty would remain in effect until Quatsch pledged the 192,771 shares of Color Health stock as collateral, after which point Sittler and Quatsch Trust's obligations as guarantors would be released. Id. § 5(b); Promissory Note § 14(h). Under the guaranty, Sittler and Quatsch Trust could be liable for up to $8.5 million, plus any increase in the value of Color Health stock over $83 per share and costs and legal fees. Guaranty Agreement § 1(a)–(b).

**B. Post-Loan Events**

On four occasions in April, May, and June 2022, Color Health stock sold for between $61 and $65 per share. Share Purchase Table (dkt. 28-1) at CH00192. Sittler denies knowledge of these transactions and did not report them to Crescent Cove or pledge additional shares. Sittler Opp. Decl. (dkt. 34-1) ¶¶ 19–21.

But in April 2023 Crescent Cove's managing member, Jun Hong Heng, became aware that Color Health stock might be valued at less than $83 per share. Id. ¶¶ 10–11; Caraher Email (dkt. 34-5). Heng reached out to Sittler, provided him this information, and sought to amend the promissory note to adjust the stock value of Color Health to $50 per share and increase the number of shares pledged as collateral. Sittler Opp. Decl. ¶¶ 12–14; Caraher Email.

The parties then spent several months discussing a potential amendment to the note. On May 5, 2023 Heng and Sittler spoke on the phone about amending the Color Health share price to $50 per share and increasing Quatsch's pledge of Color Health shares to 320,000 shares (which would still total $16 million in collateral). Heng Decl. (dkt. 41-1) ¶ 4. Sittler followed up four days later with the following email:

> Per our conversation, we have jointly determined the current fair market value of Color stock to be $50/share for the purposes of the loan issued to me by Crescent Cove of 04/04/2022. It is difficult to know the true price of Color common stock in this environment since there is extremely limited liquidity and there

> are no regular transactions involving the equity. Given what we currently know about market conditions and limited conversations with potential buyers and sellers of the stock, we believe that $50/share represents a reasonable estimate. We will adjust the amount of collateral posted to support the loan to 320,000 shares to reflect this new fair market value. I will contact Color to have the shares moved to Quatsch Investments, LLC. … For future valuations, we should undertake the same process. To my knowledge, this represents the last term between us required to complete the agreement to collateralize this loan on my Color stock.

May 9, 2023 Email (dkt. 35-7). The parties continued conversations about amending the note through September 2023. See, e.g., June 27, 2023 Email (dkt. 35-8); June 29, 2023 Email (dkt. 35-10); July 25, 2023 Email (dkt. 35-11); Sept. 20, 2023 Email (dkt. 35-12). But they never signed or executed a written agreement after Sittler's May 9 email. Sittler Decl. ¶ 25.

On October 13, 2023, Heng called Sittler to state that Quatsch needed to pledge additional shares as collateral because Color Health's stock price had dropped. Id. ¶ 16; see also Compl. (dkt. 1) ¶ 14. On October 29, 2023, Quatsch purported to finalize its pledge of 192,771 shares. See Pignato Email (dkt. 31-14). But Quatsch did not pledge additional shares, so Crescent Cove noticed events of default on November 1 and December 27, 2023, contending that Quatsch needed to pledge 320,000 shares under the amended note. Sittler Opp. Decl. ¶ 17; Nov. 1 Letter (dkt. 34-15); Dec. 27 Letter (dkt. 34-18). Then, in March 2024, Crescent Cove accelerated the loan and demanded immediate payment of over $8.5 million. Notice of Acceleration (dkt. 34-7). The following month Quatsch tendered 192,771 shares of Color Health stock to Crescent Cove. Apr. 5 Letter (dkt. 34-19).

### C. Procedural History

Plaintiffs Sittler, Quatsch, and Quatsch Trust filed this action seeking declaratory judgment (1) that the personal guaranty was released and (2) that the promissory note was not amended between May and October 2023. Compl. ¶¶ 75, 80. Crescent Cove raised four counterclaims: (1) a claim for breach of the promissory note; (2) a declaratory judgment claim that the personal guaranty was not released; (3) a declaratory judgment

claim that the promissory note was amended in May 2023 and that an event of default occurred under the amended note; and (4) an unjust enrichment claim. Ans. (dkt. 14) Counterclaims ¶¶ 41, 46, 49, 52. Crescent Cove has since abandoned its unjust enrichment claim. Opp. to Pls.' MSJ (dkt. 41) at 13 n.4.

Both parties have now filed cross-motions for summary judgment. Crescent Cove moves for summary judgment on Plaintiffs' claims and two of its counterclaims, asserting that its remaining counterclaim would thus be mooted. Def.'s MSJ (dkt. 27) at 2. Plaintiffs move for summary judgment on their claims and all of Crescent Cove's counterclaims. Pls.' MSJ (dkt. 35) at 24.

## II. LEGAL STANDARD

Summary judgment is proper when there is "no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

The moving party bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once it has done so, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c). If the nonmoving party fails to do so, "the moving party is entitled to a judgment as a matter of law." Celotex, 477 U.S. at 323.

## III. DISCUSSION

The Court begins by addressing the question of subject-matter jurisdiction. From there, the Court takes Crescent Cove's motion in two parts—first as to its breach-of-

contract claim and then as to its request for a declaration that the personal guaranty was not released. The Court grants Crescent Cove's motion as to the first part and denies it as to the second. Last, the Court turns to Plaintiffs' motion, which it denies.

**A. Subject-Matter Jurisdiction**

Though neither party has raised this as an issue, the Court must independently confirm that it has subject-matter jurisdiction before it can reach the merits of the parties' motions. Rains v. Criterion Sys., Inc., 80 F.3d 339, 342 (9th Cir. 1996). Plaintiffs assert diversity of citizenship as the basis for federal subject-matter jurisdiction. Compl. (dkt. 1) ¶ 27. Diversity jurisdiction is proper where the parties are citizens of different states, as here, and the matter in controversy exceeds $75,000. 28 U.S.C. § 1332(a). "The amount in controversy is evaluated only with reference to the complaint and does not take into account counterclaims." Breckenridge Prop. Fund 2016, LLC v. Gonzalez, No. 17-cv-3915-JCS, 2017 WL 3381155, at *3 (N.D. Cal. Aug. 7, 2017).

In cases like this one, where the plaintiff seeks only declaratory relief, "the amount in controversy is measured by the value of the object of the litigation." Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 347 (1977). "Although it can be difficult to place a dollar value on declaratory and injunctive relief, in order to properly invoke subject matter jurisdiction, Plaintiffs must do so." Mahoney v. VideoClix Techs., Inc., No. 08-cv-2581-FMC, 2008 WL 11338473, at *3 (C.D. Cal. July 28, 2008)

In their complaint Plaintiffs seek (1) "a declaration that the conditions for the release of the Personal Guaranty have been satisfied and that the April 4, 2022 Personal Guaranty is released" and (2) "a declaration that the Note was not amended and that statements made by or on behalf of the Plaintiffs in the context of negotiations regarding prospective modifications to the Note do not constitute a 'FMV' event as that term is defined in the Note." Compl. at 15. Plaintiffs do not neatly connect the dots to articulate the monetary value of these declarations in their complaint. That said, one issue that Plaintiffs raise appears to be whether Sittler remains personally liable for over $8 million. Id. ¶ 33. This meets the amount-in-controversy requirement of § 1332(a). See Bitter v.

Windsor Sec., LLC, No. 13-cv-5022-WHO, 2014 WL 1411219, at *7 (N.D. Cal. Apr. 11, 2014) ("Where, for example, [one party] claims that it is entitled to a certain amount and the [other party] claims that it owes nothing at all, the amount in controversy is the amount the [latter party] contends it should not have to pay.").

Thus, the Court has subject-matter jurisdiction over this case and proceeds to evaluate the parties' arguments on the merits.

**B. Crescent Cove's Motion for Summary Judgment**

Crescent Cove's motion for summary judgment on the first count (for breach of contract) boils down to the following: First, the sub-$83 Color Health stock transactions in April, May, and June 2022 triggered reporting and pledging obligations for Quatsch. Second, Quatsch failed to meet those obligations once it knew or should have known of the transactions. Third, this constituted an event of default. Fourth, Crescent Cove properly accelerated the loan. Fifth, Quatsch's failure to pay back its loan after the acceleration breached the promissory note. Def.'s MSJ at 8–9. Plaintiffs challenge Crescent Cove's reasoning at every step. See Opp. to Def.'s MSJ (dkt. 34).

**1. Stock Transactions**

To start, Crescent Cove is correct that undisputed record evidence demonstrates that in April, May, and June 2022 there were four transactions of Color Health stock below $83 per share. See Share Purchase Table at CH00192. Plaintiffs do not argue that this evidence actually means anything different. Rather, they challenge the admissibility of the evidence on three grounds: that it lacks authentication, that it is inadmissible hearsay, and that Crescent Cove cannot interpret the evidence on its own. Opp. to Def.'s MSJ at 9–12.

**Authentication and Hearsay.** Plaintiffs' first two arguments misunderstand the admissibility inquiry on a motion for summary judgment. The key question at the summary judgment stage is whether the contents of a document would be admissible at trial, not whether the document itself would be admissible. See Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." (emphasis added)); Fraser v. Goodale,

342 F.3d 1032, 1036–37 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."). Plaintiffs rely on Canada v. Blain's Helicopters, Inc. for the proposition that documents must be authenticated before they can be used to support a motion for summary judgment. Opp. to Def.'s MSJ at 10 (citing 831 F.2d 920, 925 (9th Cir. 1987)). But this ignores that Rule 56 was amended in 2010 to permit parties to rely on any "documents" in their summary judgment briefs. Fed. R. Civ. P. 56(c)(1)(A); see also Lee v. Offshore Logistical & Transp., L.L.C., 859 F.3d 353, 355 (5th Cir. 2017); Wright & Miller, Federal Practice and Procedure, § 2722 & n.38.50 (4th ed.). Plaintiffs' citations to unpublished decisions requiring an attorney who signs a declaration to have personal knowledge of documents attached to that declaration are equally unconvincing in light of the 2010 amendments. See, e.g., Kama v. Wolf, No. 20-cv-10265-VAP, 2022 WL 18284879, at *3 (C.D. Cal. Dec. 5, 2022) (citing Orr v. Bank of Am., NT & SA, 285 F.3d 764, 777–78 & n.24 (9th Cir. 2022) (citing the pre-2010 Rule 56 language)).

Under the proper inquiry, Crescent Cove has adequately established that it would be able to present the evidence showing the 2022 Color Health stock transactions in admissible form at trial. Color Health is within subpoena distance from the Court, so Crescent Cove could subpoena a Color Health representative to either authenticate the record of the stock transactions or to testify as to the transactions themselves. See Wolfson Decl. (dkt. 44-1) ¶ 3. That is enough to show that the contents of Crescent Cove's evidence would be admissible at trial.

**Interpretation.** As its third and final point, Plaintiffs argue that Crescent Cove is unable to interpret the table of Color Health stock transactions because the table does not speak for itself. Opp. to Def.'s MSJ at 12–13. Plaintiffs assert that the table fails to establish that the transactions it purports to list qualify as "fair market value events"—that is, events that would trigger Quatsch's obligations to report a drop in Color Health's stock price and pledge additional shares. Id. Such transactions must either be (1) arms-length equity-financing transactions, (2) arms-length right-of-first-refusal transactions, or

United States District Court
Northern District of California

(3) arms-length third-party sales. Promissory Note § 2(b). Plaintiffs contend that the table does not establish that Color Health is a party to any of the stock transactions, which they claim is required to make a transaction a fair market value event. Opp. to Def.'s MSJ at 12–13.[2]

This challenge does not hold water either. Though the table is unmarked, one sub-$83 transaction recorded in the table is consistent with other record evidence showing a sale from a third party to Color Health. See Share Purchase Table at CH00192; 409A Valuations (dkt. 27-2) at CH0058. That is sufficient to establish that at least one arms-length transaction of Color Health stock occurred below $83 per share with Color Health as a party. It also supports Crescent Cove's characterization of the table as a list of Color Health stock transactions. Plaintiffs offer no competing interpretation, let alone one backed up with evidence from the record.

The table—when reviewed in the context of the full summary judgment record—therefore permits only one conclusion: there were four Color Health stock transactions between April and June 2022 at a price of below $83 per share, at least one of which involved Color Health as a party. These events would trigger Quatsch's reporting obligations and its obligations to pledge additional collateral.

**2. Knowledge**

Plaintiffs provide evidence that Sittler did not have actual knowledge of these Color Health stock transactions. See Sittler Opp. Decl. ¶¶ 19–21. But Crescent Cove does not rely on Sittler's actual knowledge of the transactions in its motion. Rather, Crescent Cove points out that Quatsch had a contractual duty to provide to Crescent Cove written notice of Color Health's updated stock price every quarter. Reply ISO Def.'s MSJ (dkt. 44) at 8–

[2] Though this point is not dispositive, Plaintiffs are incorrect that the promissory note defines fair market value only with respect to transactions involving Color Health. Reading the promissory note to require that Color Health be a party to the transaction would render two categories of fair market value events—right-of-first-refusal transactions and third-party sales—redundant. Promissory Note § 2(b); cf. Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 558 (2d Cir. 2000) ("an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable").

United States District Court
Northern District of California

9; Promissory Note § 14(g). Crescent Cove also contends that Plaintiffs had constructive knowledge of the stock transactions at least as of April 2023, when Heng notified Sittler that the stock price of Color Health had dropped. See Def.'s MSJ at 10–11; Sittler Opp. Decl. ¶¶ 10–11; Caraher Email. Crescent Cove is correct on both fronts.

For one, Quatsch had a contractual obligation not only to stay abreast of Color Health's stock price but also to inform Crescent Cove of the price on a quarterly basis. Failure to comply with this obligation would itself constitute an event of default. See Promissory Note §§ 14(g), 16(c)(i). (Crescent Cove never noticed a default on this basis despite not receiving these quarterly updates, however.) For another, Heng's April 2023 email to Sittler regarding a pending stock transaction at a price lower than $83 put Sittler on constructive notice of a potential drop in the share price of Color Health stock.[3] The promissory note, when read as a whole, does not permit Sittler to stick his head in the sand to such information and thereby defeat the contractual protections against a drop in price. See E. Ramapo Cent. Sch. Dist. v. N.Y. Sch. Ins. Reciprocal, 158 N.Y.S.3d 173, 177 (App. Div. 2021) ("Implicit in every contract is … a pledge that neither party to the contract shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract." (citations omitted)).[4] Before and especially after learning of a potential drop in price, Sittler could have inquired as to Color Health stock transactions. See Woods v. Sahara Enters., Inc., 238 A.3d 879, 890 (Del. Ch. 2020) (recognizing that shareholders (such as Quatsch) in a privately held corporation (such as Color Health) can inspect the corporation's books and records). He cannot use his failure to do so to excuse his noncompliance with his obligations under the promissory note.

Sittler's lack of actual knowledge that Color Health's stock price had dropped

[3] Plaintiffs object to Heng's email as hearsay, but the email is not offered to show that Color Health's stock price in fact dropped below $83 per share; Crescent Cove has offered other evidence to that end. Rather, Crescent Cove offers Heng's email to show that Sittler knew about a potential drop in stock price and yet did nothing. This is a classic non-hearsay use of a statement. See United States v. Dupree, 706 F.3d 131, 136–38 (2d Cir. 2013).

[4] The parties chose New York law to govern contract interpretation. See Promissory Note § 19; Guaranty Agreement § 8(d).

below $83 per share thus did not absolve Quatsch of its contractual obligations to notify Crescent Cove of the drop in price and to cure the drop by pledging more collateral.

**3. Event of Default**

Plaintiffs next contend that neither their failure to notify Crescent Cove of a drop in Color Health's stock price nor their failure to pledge additional shares constitutes an event of default. They argue that the promissory note only required them to acquire, not pledge, additional shares as collateral. In support, they cite the Negative Covenant Clause, which states that Quatsch shall not "[p]ermit the sum of … the aggregate Fair Market Value of the [original 192,771 shares] … as supplemented by any assets acquired and/or pledged in accordance with Section 16(c)(ii), to be less than $16,000,000 at any time." Opp. to Def.'s MSJ at 19 (emphasis in original) (quoting Promissory Note § 15(j)). And they cite the Event of Default Clause, which states that "prior to the satisfaction of [Quatsch's] obligations" to actually pledge its shares, Quatsch needed only to "acquire additional shares of [Color Health's] common stock and/or cash and/or Cash Equivalents" within 15 days of a sub-$83 stock transaction to bring the total value of collateral to $16 million. Id. (quoting Promissory Note § 16(c)(ii)). As Plaintiffs read these provisions, because the sub-$83 Color Health stock transactions occurred before Quatsch pledged the original 192,771 shares to Crescent Cove, Quatsch had only to acquire more shares to cure the drop in price.

Yet Plaintiffs' interpretation of these provisions is in tension with the rest of the promissory note. For example, the Event of Default Clause states (beyond the language that Plaintiffs rely on) that "following satisfaction of [Quatsch's] obligations" to pledge its shares, Quatsch must within 15 days of a sub-$83 stock transaction "acquire and pledge to [Crescent Cove] additional shares of [Color Health's] common stock and/or Cash Collateral" such that the original 192,771 shares plus additional shares (and cash or Cash Equivalents) would total $16 million in value. Promissory Note § 16(c)(ii) (emphasis added). Likewise, the full text of the Negative Covenant Clause states that Quatsch must not

United States District Court
Northern District of California

> [p]ermit the sum of (x) prior to the satisfaction of [Quatsch's] obligations [to pledge the original 192,771 shares], (i) the aggregate Fair Market Value of the [original 192,771 shares], plus (ii) the aggregate amount of unrestricted cash and/or Cash Equivalents of the Loan Parties, or (y) following satisfaction of [Quatsch's] obligations [to pledge the original 192,771 shares], (i) the aggregate Fair Market Value of the [original 192,771 shares], plus (ii) Cash Collateral held in the Cash Collateral Account, in each of the foregoing cases, as supplemented by any assets acquired and/or pledged with Section 16(c)(ii), to be less than $16,000,000 at any time.

Id. § 15(j).

Even if the language that Plaintiffs cite is ambiguous in isolation, the promissory note as a whole is not. That matters. See Amrusi v. Nwaukoni, 65 N.Y.S.3d 62, 65 (App. Div. 2017) ("To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole." (citation omitted)), abrogated on other grounds by Ajdler v. Province of Mendoza, 123 N.E.3d 233 (N.Y. 2019). Indeed, the only sensible reading of the entire note is that it obligated Quatsch to pledge additional shares as necessary to bring the total collateral value to $16 million. Any failure to mention a requirement to pledge additional shares is merely a commonsense way to deal with the fact that Quatsch could not be expected to pledge additional shares while it was still in the process of obtaining the consents necessary to pledge the original 192,771 shares. It does not, as Plaintiffs suggest, negate the plain intent of the note—that Quatsch would ultimately pledge $16 million in collateral.

Accordingly, Quatsch's failure to pledge additional shares to the 192,771 original shares following sub-$83 Color Health stock transactions constitutes an event of default.

**4. Acceleration**

Plaintiffs do not contest that Crescent Cove issued two notices of default in November and December 2023 and then a notice of acceleration in March 2024. See Opp. to Def.'s MSJ at 21. Rather, Plaintiffs argue that Crescent Cove cannot rely on those documents because they were based on an alleged amendment to the promissory note rather than the sub-$83 Color Health stock transactions and Quatsch's subsequent failure to pledge additional shares. Id.

Plaintiffs fail to cite any legal authority or contractual provisions that would have required Crescent Cove to identify the specific basis for a notice of default or a notice of acceleration. They cite Notarnicola v. Lafayette Farms, Inc., which held that when a party failed to exercise a contractual acceleration option, the loan did not mature at an earlier date. See 733 N.Y.S.2d 91, 92 (App. Div. 2001). Notarnicola did not address what occurs when, as here, a party does issue a notice of acceleration but (arguably) does so on the wrong grounds. Plaintiffs also cite the Event of Default Clause, which provides that, "[f]ollowing the occurrence of an Event of Default … [Crescent Cove] may at its option … accelerate and declare the Obligations immediately due and payable in full … ." Promissory Note § 16. But that provision does not require Crescent Cove to correctly justify a notice of acceleration or default, especially when there were events of default that Crescent Cove could not have known about. See id. And in any case, Plaintiffs also "waive[d] presentment and demand for payment … and notice of intent to accelerate the Maturity Date (and of such acceleration)." Id. § 11. Given this waiver, Plaintiffs cannot rely on Crescent Cove's unawareness of the sub-$83 stock transactions (which, incidentally, was caused by Plaintiffs' own failure to provide timely updates) to claim that Crescent Cove's notices of default and notice of acceleration were deficient.

The March 2024 notice of acceleration was therefore proper.

**5. Failure to Pay**

Plaintiffs lastly point out that Quatsch tendered to Crescent Cove 192,771 shares of Color Health stock, which could come out to over $8 million (the value of the loan) even with a value of under $83 per share. Plaintiffs characterize their argument as going to whether Crescent Cove suffered damages, not as to whether they did or did not breach the promissory note. Opp. to Def.'s MSJ at 22.

To be sure, damages is an essential element of a breach-of-contract claim. See Costoso v. Bank of Am., N.A., 74 F. Supp. 3d 558, 569 (E.D.N.Y. 2015). But Plaintiffs incorrectly assume that they only owed $8 million under the note, even though the note provides for a heightened interest rate, costs, expenses, and fees, including attorney fees.

United States District Court
Northern District of California

See Promissory Note §§ 16, 25. And importantly, Crescent Cove does not move for summary judgment as to the amount of damages—only as to whether a breach of the promissory note actually occurred. See Reply ISO Def.'s MSJ at 13. As litigation proceeds in this case, Plaintiffs can certainly still challenge whether Crescent Cove actually incurred damages (and if so, how much) in light of the shares they transferred.

Crescent Cove has established that Quatsch breached the promissory note by not repaying the $8 million loan (plus other charges) after an event of default and notice of acceleration. The Court therefore grants summary judgment as to liability on Crescent Cove's counterclaim for breach of contract.

**C. Crescent Cove's Motion for Summary Judgment on Personal Guaranty**

Crescent Cove next contends that Quatsch's pledge of the original 192,771 shares was insufficient to release Sittler and Quatsch Trust as guarantors. Def.'s MSJ at 13. The promissory note states that Sittler and Quatsch Trust's obligations under the personal guaranty would be released if Quatsch satisfies certain "Pledged Collateral Conditions." Promissory Note § 14(h); see also Guaranty Agreement § 5(b) (referring to "Pledged Collateral Conditions"). The note defines those conditions as follows:

> No later than five (5) Business Days after obtaining the [consents necessary to pledge 192,771 shares of Color Health stock] (or such later date as Agent may agree in its sole discretion), [Quatsch] shall (x) provide … a pledge or security agreement and appropriate certificates and powers or financing statements, pledging all of the Specified Interests and Borrower Equity Interests, in form and substance reasonably satisfactory to Agent, to Agent … , (y) execute, deliver and file or record all further instruments and documents … , and will take all further actions that Agent may reasonably request in order to perfect and protect any pledge or security interest granted to Agent or to enable Agent to exercise and enforce its rights and remedies under any Loan Document, and (z) provide to Agent all other documentation which, in its reasonable opinion, is appropriate with respect to the execution and delivery of the applicable documentation referred to above.

Id.

Thus, Quatsch had to pledge Crescent Cove only (1) the "Specified Interests" and (2) the "Borrower Equity Interests." The promissory note defines Specified Interests as

"192,771 shares of common stock of [Color Health] and all substitutions therefor and replacements thereof, together with any securities entitlements related thereto." Id. § 1. And it defines Borrower Equity Interests as "100% of the Equity Interests of [Quatsch]." Id. § 14(h). Putting this all together, it appears that Quatsch could satisfy the Pledged Collateral Conditions—and, as a result, release Sittler and Quatsch Trust from their obligations under the personal guaranty—by pledging only the original 192,771 shares. And Plaintiffs have provided evidence suggesting that Quatsch did just that. See Pignato Email. Therefore, summary judgment for Crescent Cove as to its claim for declaratory relief (or as to Plaintiffs' opposing claim for declaratory relief) would be improper.

At the hearing, Crescent Cove opposed this result, arguing that if an event of default occurred before Quatsch pledged the Specified Interests, then that would preclude a discharge of the guaranty. This expands on an observation that Crescent Cove made in its briefs. See Def.'s MSJ at 9 ("Crescent Cove would have been able to accelerate the repayment of the Note and call on the Personal Guaranty prior to the date of any purported release of the Personal Guaranty." (emphasis added)). But Crescent Cove has identified no provision of the promissory note or guaranty that operates retroactively like that. To the contrary, the language of the guaranty suggests that Sittler and Quatsch Trust's obligations kicked in only at the time the payment of the loan was due, "whether at stated maturity, by acceleration or otherwise," and that until then their obligations could be released "[a]t such time as" Quatsch pledged the original 192,771 shares. Personal Guaranty §§ 1(a), 5(b).

Accordingly, the Court **DENIES** Crescent Cove's motion for summary judgment as to its declaratory judgment claim. Moving forward, Crescent Cove may continue to argue that the personal guaranty was not released for other reasons, such as that the promissory note was amended, that Quatsch failed to adequately pledge the Specified Interests, or that the equities warrant holding Sittler and Quatsch Trust to their obligations as guarantors.

### D. Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment on both of their declaratory judgment claims (regarding the alleged amendment of the promissory note and the release of the personal

guaranty) and on all of Crescent Cove's claims. Crescent Cove's only live claims are declaratory judgment claims on the same issues as Plaintiffs' claims. In short, then, Plaintiffs' motion raises two issues: (1) whether the promissory note was amended and (2) whether Sittler and Quatsch Trust were released from their obligations as guarantors.

**1. Amendment**

The promissory note provides that it "may be amended only by an instrument in writing intended for that purpose executed jointly by an authorized representative." Promissory Note § 18. Plaintiffs contend that Sittler's May 9 email to Heng laying out the terms of the amendment was not an instrument, not intended for the purpose of amending the note, and not executed jointly by the parties. Yet Plaintiffs have not established these points beyond a genuine dispute of material fact.

First, an email can be an instrument—especially where, as here, the original contract expressly anticipates email communication. Rubinstein v. Clark & Green, Inc., 395 F. App'x 786, 788 (2d Cir. 2010) (citing Stevens v. Publicis, S.A., 854 N.Y.S.2d 690, 692 (App. Div. 2008)); see also Promissory Note § 24 (expressly mentioning email as a means of communicating regarding the note). Plaintiffs argue that the May 9 email was only a draft of the amendment, so it is not itself an instrument. See Pls.' MSJ at 13 (citing Rubinstein, 395 F. App'x at 788 ("While an exchange of emails may constitute a binding contract under New York law, that is not the case 'where the parties contemplate further negotiations and the execution of a formal instrument.'" (citations omitted))). But unlike the email in the case Plaintiffs cite, the May 9 email itself does not "plainly establish the parties' intent to execute a formal contract beyond their email exchange." Rubenstein, 395 F. App'x at 788. To the contrary, the email appears to definitively resolve all material terms and details. See May 9, 2023 Email ("Per our conversation, we have jointly determined the current fair market value of Color [Health] stock to be $50/share for the purposes of the loan issued to me by Crescent Cove on 04/04/2022. … We will adjust the amount of collateral posted to support the loan to 320,000 shares to reflect this new fair market value." (emphasis added)). Thus, it is not appropriate to grant summary judgment

on the grounds that the May 9 email was not an instrument.

Second, the May 9 email expressly and repeatedly refers to the promissory note, even stating that the parties would "adjust" the number of shares pledged. Id. So Plaintiffs' argument that "the May 9 email makes no mention of the Note or an amendment to it at all" and thus evinces no intent to amend, see Pls.' MSJ at 13, is baseless. As for external conversations between the parties, both before and after May 9, those cut both ways. Compare Reply ISO Pls.' MSJ (dkt. 47) at 2 (citing text messages from May 8), with Opp. to Pls.' MSJ at 15–16 (citing emails after the May 9 email). They certainly do not establish what the parties intended beyond a genuine dispute of material fact.

Third, the promissory note required only that any amendment be jointly executed, not jointly signed or otherwise agreed to in writing. Promissory Note § 18. A contract becomes executed once it is brought "into its final, legally enforceable form." Execute, Black's Law Dictionary (12th ed. 2024). And "written documents can be enforced even if they are not signed." Flores v. Lower E. Side Serv. Ctr., Inc., 828 N.E.2d 593, 597 (N.Y. 2005). The case law that Plaintiffs cite is not to the contrary; in each of those cases, and unlike here, the underlying contract required that any amendment be signed to be valid.[5] See Prime Income Asset Mgmt., Inc. v. Am. Real Estate Holdings L.P., 918 N.Y.S.2d 467, 469 (App. Div. 2011); Deutsche Bank AG v. JPMorgan Chase Bank, No. 04 Civ. 7192(SHS), 2007 WL 2823129, at *23–24 (S.D.N.Y. Sept. 27, 2007). Nor is the Court persuaded by Plaintiffs' argument that Sittler sent the May 9 email in his individual capacity, rather than as an agent of Quatsch. See Pls.' MSJ at 13–14. Various aspects of the email—such as its subject line ("Quatsch follow up") and Sittler's repeated use of "we" when referring to Quatsch's contractual obligations—indicate that Sittler may have been speaking as an agent of Quatsch. May 9, 2023 Email. That is enough to create a genuine

[5] Plaintiffs suggest that the promissory note did require that any amendments be signed, see Reply ISO Pls.' MSJ at 3, but this relies on a misleading alteration to the note's language. The note stated that it, "the other Loan Documents and any amendments, waivers, consents or supplements hereto and thereto may be executed in counterparts," but it only required a signature for the execution of the promissory note itself. Promissory Note § 17.

United States District Court
Northern District of California

dispute of material fact as to whether Sittler sent the email as an agent of Quatsch. See Herbert Constr. Co. v. Cont'l Ins. Co., 931 F.2d 989, 994 (2d Cir. 1991) ("The existence of apparent authority is a question of fact." (citation omitted)).

Because there remain genuine questions of material fact as to whether the parties satisfied the contractual requirements for amending the promissory note, the Court denies Plaintiffs' motion for summary judgment as to both parties' declaratory judgment claims relating to amendment of the note.[6]

### 2. Guaranty Agreement

As discussed above, the promissory note as originally drafted appears to require only that Quatsch pledge 192,771 shares in order to release Sittler and Quatsch Trust from their obligations as guarantors. This was enough to defeat Crescent Cove's motion for summary judgment as to the guaranty agreement. But that does not mean that summary judgment is warranted the other way. For instance, the still-unresolved question of amendment necessarily implicates how many shares Quatsch needed to pledge in order to release the guaranty. See May 9, 2023 Email ("We will adjust the amount of collateral posted to support the loan to 320,000 shares to reflect this new fair market value."). Thus, the Court denies Plaintiffs' motion for summary judgment as to both parties' declaratory judgment claims relating to the guaranty agreement.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Crescent Cove's motion with respect to liability on its breach of contract claim, **DENIES** Crescent Cove's motion with respect to both parties' declaratory judgment claims, and **DENIES** Plaintiffs' motion in full.

[6] The parties also discuss a four-factor test as to whether parties to a contract intend to be bound in the absence of a formal written agreement. But they seem to agree that the promissory note's requirements for amendment override this background rule. See Pls.' MSJ at 14 ("Even if the Court were to dispense with the Note's express provisions … summary judgment is still warranted." (emphasis added)); Opp. to Pls.' MSJ at 18 ("Because the May 9 Email satisfies the Note's three-fold requirements to amend, no further inquiry is required."). The Court agrees: a contract's terms take precedence over background rules of contract. See New York v. New Jersey, 598 U.S. 218, 224 (2023).

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: June 10, 2025

CHARLES R. BREYER
United States District Judge